NOT DESIGNATED FOR PUBLICATION

No. 118,391

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TAMIKA PLEDGER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed May 10, 2019. Affirmed.

*Kevin P. Shepherd*, of Law Office of Kevin P. Shepherd, of Topeka, for appellant.

*James L. Spies*, special prosecutor, of The Law Office of James L. Spies, P.A., of Kansas City, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., BUSER and STANDRIDGE, JJ.

PER CURIAM: Tamika Pledger appeals her convictions and sentence for three counts of aggravated battery and one count of involuntary manslaughter, all of which occurred when she hit Essence Robinson, Brandi Glover, Tierra Smith, and Mark Britt with her car in January 2015. The issues on appeal are extensive, so we will start our opinion with an overview of each issue. Later, we'll discuss each issue in more detail.

First, Pledger claims that the district court didn't have jurisdiction over her case because the State's charging document (called an information) was defective. But we find

that the charging document met the legal standard set out by the Kansas Supreme Court in *State v. Dunn*, 304 Kan. 773, 811-12, 375 P.3d 332 (2016)—that "it has alleged facts that would establish the defendant's commission of a crime recognized in Kansas" so that "[i]f those factual allegations, proved beyond a reasonable doubt, would justify a verdict of guilty, then the charging document is statutorily sufficient."

Second, Pledger argues that the State violated the disclosure rules from *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to turn over some evidence until a year after the accident. But Pledger doesn't prove that the State withheld evidence or that the evidence would have helped prove her innocence. Nor does she show how she suffered any prejudice because of the State's alleged late production of the evidence. Pledger has therefore failed to prove the elements required to show a *Brady* violation.

Third, Pledger argues that the chief judge of the district court erred by denying her motion to recuse the judge presiding over her case without first hearing evidence. But the statute providing the procedures for disqualifying a judge calls for review of an affidavit, not an evidentiary hearing. The chief judge then reviews "the legal sufficiency of the affidavit." See K.S.A. 20-311d(b). That's what was done here.

Fourth, Pledger claims the district court erred by denying her motion to suppress evidence from what she says was an illegal search of her car. But a defendant must object when the evidence is presented at trial to preserve this objection. See *State v. Richard*, 300 Kan. 715, 726, 333 P.3d 179 (2014). Pledger didn't object, so we can't consider this issue on appeal.

Fifth, Pledger argues that the district court erred in its jury instructions by not instructing on (1) contributory negligence, (2) intervening causes, (3) wanton conduct, and (4) vehicular homicide. But the district court was right not to give these instructions:

2

- The evidence didn't show that there was any contributory negligence by the victims.
- The evidence didn't suggest an intervening cause for Tierra's death; the only evidence about a cause of death came from a medical professional who said that Tierra died from injuries she sustained in the accident.
- The State didn't present evidence of wanton conduct and never based its theory of prosecution on wanton evidence.
- Pledger asked the court to not instruct the jury on a lesser included charge. So she cannot argue on appeal that the court erred by doing what she asked.

Sixth, Pledger claims the district court erred by denying her motion to disqualify the special prosecutor appointed to take over the prosecution for conflicts of interest based on (1) Pledger's initial consultation with the special prosecutor about him potentially representing her, (2) the special prosecutor's representation of the father of the victims in an unrelated case, and (3) the fact that her bail bondsman rented space from the special prosecutor. But Pledger has not shown a reason to disqualify the attorney who acted as special prosecutor in the case:

- Pledger didn't disclose any confidential information to the special prosecutor when she talked to him about possible representation, so there wasn't any confidential information that he could use against her in court.
- Pledger was merely a prospective client of the prosecutor, not an actual one. So rules related to the divergent interests of separate clients don't apply in any way that might benefit Pledger.
- Pledger doesn't cite any statute, rule, or court case that supports her claim that the special prosecutor should have been disqualified because he rented space to the person who posted her bail.

3

Seventh, Pledger says the district court erred by not declaring a mistrial after there were outbursts from the gallery during her testimony. But the court individually questioned each juror to make sure that the outbursts wouldn't affect their opinion of the case. It also instructed the jury to disregard what had been said. We presume the jurors followed that instruction, and Pledger hasn't provided anything to bring it into doubt. See *State v. Williams*, 299 Kan. 509, 560, 324 P.3d 1078 (2014).

Eighth, Pledger argues that the district court should have granted her motion to dismiss the charges based on statutory and constitutional speedy-trial violations. Although Pledger's trial started well outside the statutory 180-day period, most of the delays in bringing her to trial were due to Pledger's requests. The district court properly attributed the delays to Pledger, so there was no violation of her statutory right to speedy trial. As for her constitutional right to a speedy trial, only one of the four factors we are to consider—the length of delay—favors Pledger's argument. See *State v. Hayden*, 281 Kan. 112, 127, 130 P.3d 24 (2006). But none of the other factors do: Pledger was responsible for most of the delays, she didn't explicitly assert her right to speedy trial, and she hasn't demonstrated prejudice from the delay. We find no violation of her statutory or constitutional speedy-trial rights.

Ninth, Pledger claims the special prosecutor committed misconduct by commenting on Pledger's credibility during his closing argument. But the prosecutor merely encouraged the jury to draw a reasonable inference from the evidence it had observed about one of the victim's injuries that directly related to Pledger's credibility. He didn't offer an improper personal opinion about Pledger's credibility.

Tenth, Pledger claims the court should have granted her a new trial because there wasn't enough evidence to prove that she acted recklessly and because cumulative error denied her a fair trial. But the State presented evidence showing that Pledger was speeding through a residential area, and there was evidence that she knew kids had

recently been dropped off at the bottom of the other side of a hill she crested. This is enough to support the jury's finding that she acted recklessly. And the cumulative-error rule applies only when we have found some trial errors—not significant enough individually to warrant a new trial—collectively made the trial unfair. Since we haven't found any errors, that rule doesn't apply.

In addition to these arguments about the conduct of her trial, Pledger separately argues it was improper here to give her separate sentences for aggravated battery and involuntary manslaughter. She contends those convictions are all based out of a single incident and thus are multiplicitous. But the elements for aggravated battery and involuntary manslaughter aren't the same, so the convictions aren't multiplicitous. See *State v. Schoonover*, 281 Kan. 453, Syl. ¶ 15, 133 P.3d 48 (2006).

We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

With that overview, we will now review the case in more detail. The tragic events took place in January 2015 in Kansas City, Kansas. It's not in dispute that Pledger hit four young people with her car: Essence Robinson, Brandi Glover, Tierra Smith, and Mark Britt. Tierra died from her injuries about a week later. Each of the others had at least one broken leg. A jury convicted Pledger of three counts of aggravated battery and one count of involuntary manslaughter.

At trial, Pledger told the jury that at the time of the accident she lived at home with her children and her cousin, Tamya Coulter. The afternoon of the accident, Pledger spoke with Tamya on the phone, who told Pledger that people were "'trying to jump [her]'" at the school-bus stop at Troup and 13th Streets. One of Tamya's friends, Essence

5

Robinson, then got on the phone and told Pledger to hurry to the bus stop. While Pledger was still on the phone, she told her boyfriend that she was leaving to go to the bus stop.

Pledger told the jury that she "was cool" when she left her house and started driving "a normal pace." She said she wasn't angry because all she knew was that Essence had told her to "'hurry up'"—she didn't know anything about what was going on other than that she needed to go quickly to the bus stop. Pledger denied driving "at a high rate of speed" and said she knew the speed limit on the road where she was driving was 20 miles per hour.

Pledger described the route she drove to respond to the fight, which she said she was familiar with because she had been there before. Pledger also said that she knew kids had just been released from school and that a school bus drops students off at the intersection where the accident took place.

Pledger said she turned off the street where she lived onto Troup Street, which was on a steep hill. She said that as she drove on Troup towards 13th Street, which was at the bottom of the hill on Troup, she couldn't see 13th Street. It wasn't until she started driving down the other side of the hill that Pledger noticed a car parked in the street and saw a crowd of people gathering in the street. Then, Pledger said, "I stepped on my brakes [and] noticed that my car wasn't stopping." She also told the jury that she honked her car horn twice but that nobody heeded her. She said that she swerved to miss the people and the cars in the street. By the time Pledger's car stopped, she knew she had hit several people.

Pledger said that as soon as her car stopped she looked around and saw Mark Britt "pick up his shoe" from behind her car. She also said she saw Essence Robinson—one of her cousins—near the car. Pledger told the jury she "jumped out of the car" so she could help whoever needed help. Pledger said she first ran to Essence, but then she saw her

6

other cousin, Brandi Glover, and checked on her. After that, Pledger said she went to check on "the female [later identified as Tierra] that was laying . . . facedown" and "tr[ied] to check her pulse." She said she then saw Mark Britt "walking around," so she helped him lie down in a nearby grassy area. Shortly after that, she said she called 911.

Officers took Pledger into custody at the scene and held her for about two days. The State then charged her with the four counts of aggravated battery against Essence, who suffered a broken leg and an injured finger; Brandi, who suffered a broken leg and a broken wrist; Mark, who suffered two broken legs; and Tierra, who had multiple traumatic injuries. After Tierra died from her injuries, the State amended the charges to three counts of aggravated battery and one count of involuntary manslaughter.

*Britani Barnett's Testimony*

Britani Barnett, one of the people at the scene of the accident, told the jury that she was with three females at the time of the accident: Na'KeYah Barnes; LaTadra Thompson; and Tierra Smith. Britani said Tierra had called her because of a problem Tierra had at school that day. Britani, Tierra, Na'KeYah, and LaTadra drove to the bus stop at 13th and Troup and waited until a school bus arrived. When the students got off the bus, Na'KeYah and Tierra started to fight Tamya.

Britani then told the jury that during the fight she saw a car "coming down the hill . . . swerv[ing] towards where the fight was . . . ." She said the car sounded like it was going fast and "turned into the direction of where the fight was taking place." Britani also said that after the accident she was "laying in the bushes with Tierra . . . trying to get her to breathe" when Pledger approached the girls and said "'I'm so sorry. I'm so sorry. But I had to protect my family, too.'"

7

*Tamya Coulter's Testimony*

Tamya Coulter, Pledger's cousin, testified after Britani. A junior at Wyandotte High School, she rode the bus home on the day of the accident and, along with five other students, got off at the 13th and Troup stop. Tamya also said that after she got off the bus, Na'KeYah "got out of the car [and] swung on [her], and [they] started fighting in the middle of the street."

*Ray'Von Hill's Testimony*

Ray'Von Hill, another Wyandotte High School student, told the jury that when he got off the bus at the 13th and Troup stop, "[a] group of girls hopped out [of] the car and wanted to fight with [Tamya]," who was also on the bus. Soon after that, he said that a car came "flying over the hill and then everybody got hit." Ray'Von said the car was going fast and it seemed like the car was driving at "highway speed."

*Na'KeYah Barnes' Testimony*

Na'KeYah testified that she, Tierra, and Britani drove to the bus stop and waited for the bus to arrive so she could fight Tamya. She said that before the fight started, someone called Pledger "to come and stop the fight." Na'KeYah then told the jury that the fight lasted about 30 seconds and ended when she heard people screaming. She said Pledger was "screaming, saying that . . . her brakes went out and that she hit kids."

*Sergeant Steve Walsh's Testimony*

Police Sergeant Steve Walsh investigated the accident. He described how Troup, a 20- to 25-mile-per-hour residential roadway with no stop signs on it, runs from east to west and is on a "very steep" 10% grade going downhill. He also said that "cars

8

approaching from the west . . . , which is the direction of travel [Pledger's] vehicle was going prior to impact . . .[,] can't even see over the hill."

Based on skid marks left by Pledger's car, Walsh said that Pledger was driving at least 55.3 miles per hour before the accident happened. Walsh also told the jury that based on his calculations from the skid-mark measurement, Pledger would have been able to stop the car with plenty of time to spare had she been driving the speed limit of 20 miles per hour.

*Doctor Altaf Hossain*

Doctor Altaf Hossain, the Wyandotte County coroner, did the autopsy of Tierra Smith. He told the jury that Tierra had suffered injuries to her head, forehead, face, arm, trunk, and right leg and that there were indications of blunt-force trauma. Then Dr. Hossain said that Tierra had died from "blunt trauma, including head injury and specifically subdural hematoma."

*Conviction, Sentencing, and Appeal*

The jury convicted Pledger on all four counts—one count of involuntary manslaughter and three counts of aggravated battery. The district court sentenced Pledger to 64 months in prison.

Pledger then appealed to our court. In the next section, we will review each of the issues she has raised on appeal.

9

I. *The District Court Didn't Err by Denying Pledger's Motion to Dismiss for a Defective Complaint and Lack of Jurisdiction.*

Pledger claims that the district court didn't have jurisdiction over her case because the State's information was defective. She says the State's information didn't allege facts constituting a crime and "she was not advised of the facts in support of the charging document."

The State argues that Pledger didn't properly preserve this issue for appeal, but Kansas courts have held that subject-matter jurisdiction may be raised at any time, even if it's raised for the first time on appeal. *State v. Castillo*, 54 Kan. App. 2d 217, 219, 397 P.3d 1248 (2017). "The question of whether subject matter jurisdiction exists is one of law subject to unlimited review on appeal." *Dunn*, 304 Kan. at 784.

The State began its prosecution against Pledger by filing an information, one form of charging document allowed by Kansas statutes. Under K.S.A. 22-3201(b), an information "shall be a plain and concise written statement of the essential facts constituting the crime charged, which [information], drawn in the language of the statute, shall be deemed sufficient." An information "shall be signed by the county attorney, the attorney general or any legally appointed assistant or deputy of either" and "state for each count the official or customary citation of the statute . . . which the defendant is alleged to have violated." K.S.A. 22-3201(b).

In *Dunn*, our Supreme Court explained that "[a] Kansas charging document should be regarded as sufficient . . . when it has alleged facts that would establish the defendant's commission of a crime recognized in Kansas." 304 Kan. at 811-12. It also said that "[i]f those factual allegations, proved beyond a reasonable doubt, would justify a verdict of guilty, then the charging document is statutorily sufficient." 304 Kan. at 812.

Here, the State's information against Pledger satisfied the statutory and caselaw requirements. The State's second amended information against Pledger charged her with four counts. The first count said "on or about the 30th day of January, 2015, said defendant, Tamika Pledger, did unlawfully and recklessly kill a human-being, to wit: [Tierra Smith] in violation of K.S.A. 21-5405(a)(1). (INVOLUNTARY MANSLAUGHTER. Severity Level 5. Person Felony)." The second, third, and fourth counts said "on or about the 30th day of January 2015, said defendant, Tamika Pledger, did unlawfully and recklessly cause great bodily harm or disfigurement to another, to wit: [Mark Britt, Essence Robinson, or Brandi Glover] in violation of K.S.A. 21-5413(b)(2)(A). (AGGRAVATED BATTERY. Severity Level 5, Person Felony)."

Each count plainly stated who the defendant was, the date on which the alleged crimes occurred, the harm, and the statute upon which each charge was based. The facts the State alleged against Pledger established that she committed crimes recognized in Kansas. The State then proved those facts beyond a reasonable doubt at trial. We conclude, therefore, that the charging document was sufficient. See *Dunn*, 304 Kan. at 811-12.

II. *The District Court Didn't Err by Denying Defendant's Motion to Dismiss Because of* Brady *Violations.*

Second, Pledger argues that the district court erred by denying her motions to dismiss because of the State's alleged violations of the *Brady* rules for prosecutorial disclosure of information that might help a defendant. See *Brady*, 373 U.S. at 87. We have unlimited review over a district court's determination about whether a *Brady* violation took place. But if there was a violation, we review the denial of a defendant's motion to dismiss based on that violation only for abuse of discretion. *State v. Warrior*, 294 Kan. 484, Syl. ¶ 13, 277 P.3d 1111 (2012). A court abuses its discretion

when no reasonable person would agree with the court's decision or if it bases its decision on an error of fact or law. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

In *Brady*, the United States Supreme Court held that prosecutors have a positive duty to disclose evidence favorable to the accused when "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Pledger claims the State violated *Brady* by failing to turn over evidence from cell phones from the accident scene until March 2016 and by not "provid[ing] access to [her] car for independent testing until April 5, 2016." Pledger's trial began on May 22, 2017.

A defendant must prove three elements to establish a *Brady* violation: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory[] or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice." *Warrior*, 294 Kan. 484, Syl. ¶ 10. Pledger fails to prove any of these elements.

First, although Pledger says the State wrongfully withheld cellphone discovery, she doesn't tell us which cellphones were withheld. But the record shows that the State turned over the reports from at least four cellphone exams. It also shows that Pledger acknowledged receiving those reports. And in her appellate brief, Pledger admits that she received some "cell phone evidence" in March 2016.

Second, even if, as Pledger claims, the State turned over that evidence much later than it should have, she makes no attempt to explain how the State's alleged delay prejudiced her. Nor does Pledger explain what "exonerating" evidence the cellphones contained. Pledger simply says that "[b]y seizing the cell phones, the police indicated that the evidence could form the basis for exonerating [her]." That statement provides no factual basis that any of the phones had information that could help her. Nor does she point

12

to any place in the record that would support this claim or provide any legal authority for the proposition that merely seizing evidence "could form the basis for exonerat[ion]."

In short, Pledger doesn't prove that the State withheld evidence or that the evidence would have helped prove her innocence. Nor does she show how she suffered any prejudice because of the State's alleged discovery violation. Since Pledger fails to prove the three elements required to prove a *Brady* violation, the district court didn't abuse its discretion by denying Pledger's motions to dismiss based on the alleged *Brady* violations.

Pledger also argues that the district court wrongfully denied several of her pretrial motions because the court's decisions weren't supported by sufficient evidence. Before trial, Pledger filed several motions dealing with discovery including a December 2015 "WRIT TO DISMISS WITH PREJUDICE: LACK OF EVIDENCE . . . ." At a July 2016 hearing (the transcript of which isn't in the record on appeal), the district court denied Pledger's first motion to dismiss. The court granted Pledger's motion for discovery in part and found the motion moot in part. Then the court denied Pledger's motion to dismiss for lack of discovery.

Pledger argues that these decisions were incorrect because the court didn't provide "findings regarding Pledger's motions challenging the evidence," and its rulings weren't supported by sufficient evidence. It's true that the district court didn't make explicit findings in its journal entry from the hearing, but the register of actions says that the court's reasons for its decisions are "stated on the record." It was Pledger's responsibility to designate the record for appeal, and she didn't include the transcript of the hearing in which the court drew its conclusions that Pledger says weren't adequately supported by evidence. Since Pledger failed to include the transcript that would show what evidence the court considered in reaching its conclusions, we must "presume that the district court's findings were properly supported." *State v. McMullen*, 290 Kan. 1, Syl. ¶ 1, 221 P.3d 92 (2009).

13

III. *The District Court Didn't Err in Denying Pledger's Motion to Recuse the Judge for Bias.*

Next, Pledger argues that the judge who presided over her trial erred by not recusing himself. A statute, K.S.A. 20-311d(a), provides the procedure for how to get a judge disqualified based on a claim of bias. Pledger argues that the district court didn't follow proper procedures. She claims that "it was prejudicial error to deny her motion without a hearing" and "[t]he court did not follow statutory requirement[s] to have the chief judge hear evidence in support of recusal."

The standard of review for a claim of error relating to a motion for change of judge is provided in *State v. Alderson*, 260 Kan. 445, Syl. ¶ 2, 922 P.2d 435 (1996):

> "When a district court refuses to recuse itself from a trial upon the defendant's request, this court has promulgated a two-part test to determine whether the defendant received a fair trial or whether the defendant's due process rights were violated: (1) Did the trial judge have a duty to recuse himself or herself from this case because the judge was biased, prejudicial, or partial? (2) If the judge did have a duty to recuse and failed to do so, is there a showing of actual bias or prejudice to warrant setting aside the judgment of the trial court?"

Pledger's claim isn't well taken because the statutory procedure for considering the disqualification of a judge doesn't call for an evidentiary hearing—it calls only for the review by another judge of an affidavit setting out the factual basis for the disqualification claim. K.S.A. 20-311d(a) provides that when a party concludes that the assigned judge can't fairly hear the case, the party may move for a new judge. The assigned judge then "shall promptly hear the motion informally upon reasonable notice to all parties who have appeared in the case." K.S.A. 20-311d(a). This step was satisfied here; Pledger moved for the judge to recuse himself in March 2016, and after a hearing on her motion, the court denied Pledger's request.

14

When the judge presiding over the case denies a party's motion for a change of judge, "the party seeking a change of judge may [immediately] file the affidavit provided for in subsection (b)." K.S.A. 20-311d(a). That affidavit sets out the party's factual basis and legal grounds for disqualifying the assigned judge. Once that is filed, "the chief judge shall at once determine, or refer the affidavit to another district judge for prompt determination of, the legal sufficiency of the affidavit." K.S.A. 20-311d(b); see *State v. Moyer*, 302 Kan. 892, 921-22, 360 P.3d 384 (2015).

This step was also satisfied here. In her affidavit, Pledger presents several reasons why she said the assigned judge couldn't give her a fair and impartial trial. After reviewing Pledger's affidavit and the pleadings from the case, the chief judge denied Pledger's request because Pledger "failed to set out . . . the specifics for the position that Judge Russell [was] biased and [could not] provide her a fair trial." The chief judge explained that Judge Russell "did not engage in any acts that fall[] within the factors for recusal under the statute" and ultimately found that there was no basis for removing Judge Russell.

Although Pledger claims otherwise, there is no statutory requirement that the chief judge hear evidence in support of recusal; the statute requires only that the chief judge review "the legal sufficiency of the affidavit." See K.S.A. 20-311d(b). That's because the proceeding isn't designed to make factual findings about the actual truth of the allegations. That would create an unnecessary collateral process of evidentiary hearings on side issues. Instead, the judicial-disqualification process looks only at the legal sufficiency of the allegations made in supporting affidavits. *Moyer*, 302 Kan. at 921-22. Pledger's complaint that the chief judge didn't hold an evidentiary hearing has no merit.

15

IV. *Pledger Failed to Preserve for Appeal the Question Whether the Court Erred by Denying Her Motion in Limine and Motion to Suppress.*

Pledger next claims the district court erred by denying her motion to suppress evidence from what she says was an illegal search of her car. But even when the trial court has denied a pretrial motion to suppress, the party trying to suppress the evidence still must object to its introduction at trial to preserve the issue for appeal. That gives the trial judge a chance to reconsider the ruling if—in the context of the trial—the evidence should not be allowed. See *Richard*, 300 Kan. at 726. Pledger didn't object to the introduction of the allegedly illegally seized evidence at trial. So she has not preserved the issue for appeal.

Even if Pledger had preserved the issue for appeal, she hasn't shown on appeal that she had a winning argument. She challenges "all evidence obtained following the seizure of her Mercedes and [its] warrantless search." During trial, Detective Clayton Bye said that he had a search warrant to examine the crash data recorder from Pledger's car and also had a warrant to perform a mechanical inspection of the car. Pledger didn't object to this testimony at trial or offer anything to counter the evidence that there was a valid search warrant. And while Pledger suggests on appeal that the search warrant was deficient, the warrant isn't included in the appellate record and Pledger doesn't explain what the warrant was lacking.

V. *The District Court Didn't Err in Instructing the Jury as It Did.*

Next, Pledger argues that the district court erred by not instructing the jury on (1) contributory negligence, (2) intervening causes, (3) wanton conduct, and (4) vehicular homicide. We will discuss each claim separately.

*Contributory Negligence*

Pledger first argues that the district court erred by not giving the jury a contributory-negligence instruction. She didn't preserve this issue for appellate review by requesting the instruction at trial, so even if the contributory-negligence instruction should have been given but wasn't, we would set aside a jury verdict only if we are firmly convinced that the jury would have reached a different verdict had the instruction been given. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). Pledger, as the party claiming a clear error, has the burden of proving she was prejudiced by the mistake. 307 Kan. at 318.

The contributory-negligence language that Pledger says was wrongfully omitted from the jury instructions comes from *State v. Chastain*, 265 Kan. 16, Syl. ¶ 7, 960 P.2d 756 (1998). In that case, our Supreme Court explained that "[w]hile contributory negligence is no defense in a prosecution for a driving offense of involuntary manslaughter or vehicular homicide, it is a circumstance to be considered along with all other evidence to determine whether the defendant's conduct was or was not the proximate cause of a decedent's death." 265 Kan. 16, Syl. ¶ 7. "In some instances, a decedent's contributory negligence may have been a substantial factor in his or her death and a superseding cause thereof; it may have intervened between a defendant's conduct and the fatal result so as to be itself the proximate cause." 265 Kan. 16, Syl. ¶ 7.

Pledger says the court should have instructed the jury on contributory negligence because "Pledger was faced with a crowd of people in the middle of the street." But that doesn't mean a contributory-negligence instruction was appropriate. First, Pledger's decision to speed over a hill where she couldn't see what was on the other side—after she knew kids had just been let off by a school bus there—was the cause of what happened. Second, Pledger presented her testimony that given the location of the children in the street, she tried to avoid them, and that point was also argued by her attorney in closing

17

argument. We conclude that the result of Pledger's trial would have been the same even if the court would have included that instruction.

The jury heard testimony that three girls started fighting in the street of a residential area after they got off the bus. But although there was evidence that people were fighting in the street in a residential area, there was also evidence showing that Pledger was going well over double the speed limit on that street, that she knew the area where she was driving (with a steep hill and no way to see what was on the other side of it), and that she knew while she was speeding down the road that kids had recently gotten off the bus on the other side of the hill. Given the rate of speed at which Pledger was travelling down the hill, it's doubtful that those who were in the street would have been able to get out of the way even if they had been carefully watching for cars cresting the hill and not in the middle of a fight. And any pedestrian could have been crossing this residential street as Pledger sped toward them. We conclude that a contributory-negligence instruction wasn't needed and that its absence didn't affect the jury's verdict.

*Intervening-Cause Instruction*

Next, Pledger argues that the court erred by not including an instruction on intervening causes. She says that "medical malpractice was the intervening cause that precipitated the death" of Tierra.

Pledger didn't request this instruction at trial, so even if we find that the instruction would have been both legally and factually appropriate, we would also have to decide whether the failure to give it was clearly erroneous, meaning we would have to be "firmly convinced the jury would have reached a different verdict had the instruction been given" to set aside the jury's verdict. *State v. Littlejohn*, 298 Kan. 632, Syl. ¶ 2, 316 P.3d 136 (2014).

The intervening-cause instruction Pledger says the jury should have received would not have been factually appropriate; neither party presented any evidence of medical malpractice at trial. To the contrary, Dr. Hossain told the jury that he thought Tierra died from "blunt trauma, including head injury and subdural hematoma." He never made any indication that there were other underlying causes that might have contributed to Tierra's death. Since there was no evidence of medical malpractice presented at trial, it would have been inappropriate for the court to instruct on an intervening cause of medical malpractice. See *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Wanton-Conduct Instruction*

Pledger also claims the district court "should have instructed the jury that the aggravated battery and involuntary manslaughter charges require 'wanton conduct'" instead of reckless conduct. As the State points out, though, Pledger didn't object to including "reckless" in the jury instruction instead of "wanton," so again, even if a "wanton" instruction were factually and legally appropriate, we would reverse only for clear error.

Here, the State charged Pledger with involuntary manslaughter and aggravated battery. For each charge, the State chose to pursue convictions under the subsections that specifically require a reckless mental state. See K.S.A. 2018 Supp. 21-5405(a)(1) ("Involuntary manslaughter is the killing of a human being committed: [1] Recklessly[.]"). Compare K.S.A. 2018 Supp. 21-5413(b)(2)(A) (the subsection with which the State charged Pledger: "[a]ggravated battery is: . . . recklessly causing great bodily harm to another person or disfigurement of another person") with K.S.A. 2018 Supp. 21-5413(b)(1)(C) (defining aggravated battery by wanton conduct as "knowingly causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm,

19

disfigurement or death can be inflicted"). And at trial, the State presented evidence showing Pledger's recklessness and argued that Pledger acted recklessly.

The State did not present evidence of wanton conduct and never charged Pledger with wanton conduct. So instructing the jury on wanton conduct instead of reckless conduct would not have been factually or legally appropriate.

*Lesser-Included Vehicular-Homicide Instruction*

Finally, Pledger argues that the district court erred by not including a lesser-included vehicular-homicide instruction in the jury instructions. Pledger acknowledges that during the jury-instruction conference at trial, she asked the court not to include any instruction on lesser included offenses.

Generally, a party may not invite or prompt error in a case and then complain of that error as a ground for reversing an adverse judgment. *State v. Divine*, 291 Kan. 738, 742, 246 P.3d 692 (2011). In other words, a party cannot complain to an appellate court about something they or their lawyer asked for (or invited). If a party gets what they ask for from a district court, we will not reverse the judgment even though the party now says the result of their request was improper on appeal.

When it comes to jury instructions, our Supreme Court has held invited error undermines a defendant's statutory right to receive jury instructions on lesser included offenses as provided in K.S.A. 2018 Supp. 22-3414(3). See *State v. Angelo*, 287 Kan. 262, 279-80, 197 P.3d 337 (2008). In that case, Angelo argued that the district court should have given a lesser-included instruction over his objection. The Supreme Court disagreed: "Angelo invited this error[, and a] litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal." 287 Kan. at 280.

20

The same thing happened in Pledger's case—the district court gave no instruction on lesser included offenses at Pledger's request. Since Pledger asked the district court to take that action, we find that any error was invited by her; she is precluded from arguing that the court's action was incorrect on appeal. See *State v. Lowery*, 308 Kan. 1183, 1216-18, 427 P.3d 865 (2018) (declining to review a challenge to a jury instruction because the appellant invited the error).

## VI. *The District Court Didn't Err by Denying Pledger's Motion to Disqualify the Special Prosecutor Because of Conflicts of Interest.*

Pledger argues that the district court erred by denying her motions to disqualify special prosecutor James Spies from the case because of various conflicts of interest. We review a district court's decision on a motion to disqualify an attorney from a case for an abuse of discretion. *State v. Cope*, 30 Kan. App. 2d 893, 895, 50 P.3d 513 (2002) (citing *State v. Dimaplas*, 267 Kan. 65, 67-68, 978 P.2d 891 [1999]); *State v. Camacho*, No. 106,698, 2013 WL 195225, at *1 (Kan. App. 2013) (unpublished opinion) (citing *Cope*). A court abuses its discretion when no reasonable person would agree with the court's decision or if it bases its decision on an error of fact or law. *Ward*, 292 Kan. at 550.

Pledger first claims there was a conflict of interest because she called Spies and requested that he represent her here. She says that she "disclosed privileged information to [Spies]" during that phone call.

At the pretrial hearing on Pledger's motion to disqualify Spies, Spies acknowledged that "at some point in time after Miss Pledger was charged in this case, she did . . . call [his] office" about possibly defending Pledger here. Then he told the court that he immediately told Pledger that he couldn't represent her in the matter. Spies said his conversation with Pledger didn't last "more than a minute or a minute-and-a-half" and confirmed that he and Pledger didn't have any discussion about the facts in her case.

21

Pledger, on the other hand, suggested that the conversation she had with Spies was more in depth.

Pledger's second claim about a conflict has to do with Spies' ongoing representation of Jeffery Smith, the father of Tierra Smith. Spies explained how Jeffery Smith was one of his "ongoing client[s]," but that "Mr. Smith has had absolutely nothing to do with [Pledger's case]." Spies also denied having discussed Pledger's case with Smith at all "other than the fact that [he] was aware that [Smith was] coming to town for the trial."

Spies told the court that he spoke with an employee at the office of the Disciplinary Administrator, who concluded that there wasn't a conflict of interest in the case and there was nothing precluding him from prosecuting the matter.

After hearing both sides, the district court first concluded that the fact that Pledger called Spies to ask about possibly hiring him to represent her didn't create a conflict. The court explained that "nothing was stated by Miss Pledger in that [phone] conversation, and [Spies] gained nothing in that conversation that he would take advantage of . . . as a prosecutor in this case."

Then the court found that Spies' client relationship with Smith was unrelated to Pledger's case "in the sense that what [Spies was] representing Mr. Smith [for] ha[d] nothing to do with this case." We agree with the district court.

*Pledger's Initial Phone Call Asking Spies to Represent Her Didn't Create a Conflict.*

On appeal, Pledger argues that Spies should have been disqualified as special prosecutor because she didn't consent to Spies prosecuting the case after she consulted with Spies about possibly representing her.

Pledger supports her position by claiming that she was a former client of Spies and thus conflicts rules about former clients apply. But "[a] person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client," not yet an actual one. Kansas Rule of Professional Conduct 1.18(a) (2019 Kan. S. Ct. R. 343). So the rules on former-client conflicts do not apply, and she did not have to consent to Spies' representation of the State in the case against her.

That doesn't mean that no protections exist for prospective clients who talk with an attorney about potential representation. "Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information, except as [lawyer-confidentiality rules] would permit with respect to information of a former client." Kansas Rule of Professional Conduct 1.18(b) (2019 Kan. S. Ct. R. 343). But our record does not show that Pledger disclosed any confidential information to Spies that he could use against her in court.

Pledger claims in her appellate brief that she "called James Spies to retain him as counsel and disclosed privileged information to him." But she provides no explanation about what information she claims to have provided and no citation to evidence in the record that might support her claim. Pledger has not shown that the district court's conclusion that there was no disqualifying conflict because of Pledger's phone call asking for Spies' legal services was based on either a legal or factual error, and a reasonable person could agree

23

with the conclusion. We therefore find no abuse of discretion in the district court's denial of Pledger's motion to disqualify Spies because of her brief phone call with him to see whether he might represent her.

*There Was No Conflict Because Spies Represented Victim Tierra Smith's Father in an Unrelated Case.*

Pledger next claims that Spies should have been disqualified because he represented Tierra Smith's father in a different case. Kansas Rule of Professional Conduct 1.7 (2019 Kan. S. Ct. R. 308) prohibits an attorney from representing a client whose interests conflict with the interests of another client. But here, Spies told the court that he didn't represent Tierra's father in anything substantially related to Pledger's case. Spies also confirmed that he hadn't discussed Pledger's case with Tierra's father. And as we've already noted, Pledger was never Spies' client, so the rules that Pledger cites that forbid lawyers from representing clients with conflicting interests unless each client consents don't apply here. We find no abuse of discretion in the district court's refusal to disqualify Spies based on his representation of Tierra's father in an unrelated matter.

*The Office-Rental Situation of Pledger's Bail Bondsman Didn't Create a Conflict.*

Finally, Pledger claims that there was a conflict because her bail bondsman, Brian Underwood, rented office space from Spies. Pledger provides no explanation about why the fact that Spies rents office space to Pledger's bondsman creates a disqualifying conflict of interest. We can't come up with one. There has been no showing that Underwood had confidential information about the case or that he and Spies ever discussed the case. We find no abuse of discretion in the district court's refusal to disqualify Spies based on Spies' landlord-tenant relationship with Underwood.

24

VII. *The District Court Didn't Err by Not Declaring a Mistrial After Outbursts at Trial.*

Pledger argues that the district court erred by not declaring a mistrial after people attending the trial made outbursts in the courtroom during Pledger's testimony. On appeal, we review denial of a motion for mistrial under an abuse of discretion standard:

> "A district judge may declare a mistrial when prejudicial conduct makes it impossible to proceed with a trial without injustice to the defendant. Declaration of a mistrial is a matter entrusted to the trial court's discretion, and the judge's choice will not be set aside without an abuse of that discretion." *State v. Dixon*, 289 Kan. 46, Syl. ¶ 1, 209 P.3d 675 (2009).

A court abuses its discretion if no reasonable person could agree with its decision or if its decision is based on an error of fact or law. *Ward*, 292 Kan. at 550.

A district judge may declare a mistrial because of "[p]rejudicial conduct, in or outside the courtroom, [which] makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c). In applying this statute, a district court must: (1) determine whether there was some fundamental failure of the proceeding; and (2) if so, determine whether it is possible to continue the trial without an injustice. *Ward*, 292 Kan. at 550. The court must analyze whether the damaging effect of any prejudicial conduct can be removed or mitigated by admonition or instruction to the jury. If not, and if the degree of prejudice would cause an injustice, a mistrial is necessary. *Ward*, 292 Kan. at 550.

While Pledger was testifying, an unidentified male in the gallery said, "Bitch, you hit my daughter." A second unidentified male said, "You killed my daughter. Bitch." Then an unidentified female speaker said, "You lying. You fucking lying. You killed my son." At that time, the court cleared the courtroom and prohibited the three speakers from coming back.

25

The court conferred with the parties outside the presence of the jury; the parties agreed to question each juror individually in chambers with Pledger's attorney, the State, and the court present. Each juror told the court that the outbursts from the gallery wouldn't affect their judgment in the case. The court also instructed the jury to disregard the outbursts.

Pledger didn't move for a mistrial after the outbursts. Nor did she argue for a new trial based on the outbursts in her posttrial motion for a new trial. Although the district court here recognized the severity of the outbursts, it didn't think a mistrial was necessary. We agree.

In *State v. Kleypas*, 305 Kan. 224, Syl. ¶ 16, 382 P.3d 373 (2016), our Supreme Court held that the district court didn't err by not declaring a mistrial after a "courtroom spectator attack[ed] the defendant" because "the district court [took] immediate action by removing the jurors from the courtroom, carefully question[ing] the jurors regarding whether they [could] continue to be impartial, and instruct[ing] them to disregard the incident and not let it influence their deliberations." "All of the jurors indicated they could conform to the court's instructions, and none raised any concern to the contrary." 305 Kan. at 281.

The district court here took the same precautions as the district court in *Kleypas*. As in *Kleypas*, the court here immediately removed the jurors from the courtroom. Then it individually questioned each juror to make sure each one could still be impartial despite the outbursts. When everyone reconvened, the court instructed the jury to disregard the outbursts. Courts generally presume a jury follows a court's instructions, and Pledger has not presented any evidence to overcome that presumption. *Williams*, 299 Kan. at 560. We find no abuse of discretion in the district court's decision not to declare a mistrial in Pledger's case.

26

VIII. *The District Court Didn't Err by Denying Pledger's Motion to Dismiss for Violating Her Right to a Speedy Trial.*

Eighth, Pledger claims that the district court erred by denying her motion to dismiss because of statutory and constitutional speedy-trial violations.

*Statutory Speedy-Trial Rights*

Pledger first argues that the district court improperly denied her motion to dismiss based on statutory speedy-trial violations because "[t]he time assessed to Pledger was not allocated fairly." She says "[t]he State failed to bring her to trial within the statutory 180 day time limit even with her motions, requests for continuance, or acquiescence to the State's motions to continue." We have unlimited review over a trial court's decision about violations of a defendant's statutory right to speedy trial. *State v. Vaughn*, 288 Kan. 140, 143, 200 P.3d 446 (2009); *State v. Trimmell*, No. 114,399, 2016 WL 3569946, at *2 (Kan. App. 2016) (unpublished opinion).

Kansas law provides a statutory right to a speedy trial under K.S.A. 2018 Supp. 22-3402. Under K.S.A. 2018 Supp. 22-3402(b), the State must bring a person charged with a crime and released on bond, as Pledger was, to trial within 180 days. The State bears the burden of making sure a defendant receives a speedy trial; the defendant doesn't need to take any affirmative action to see that the State observes this right. *State v. Adams*, 283 Kan. 365, 369, 153 P.3d 512 (2007). But if a delay is caused by a defendant's application or fault, that delay stops the running of the speedy-trial clock on its countdown to 180 days. K.S.A. 2018 Supp. 22-3402(b); *State v. Brownlee*, 302 Kan. 491, 507, 354 P.3d 525 (2015). Defense counsel's actions are attributable to the defendant for speedy-trial purposes. *Adams*, 283 Kan. at 369.

27

The statutory speedy-trial clock starts running at a defendant's arraignment, which includes a defendant's waiver of arraignment. *State v. Robinson*, 306 Kan. 1012, 1018, 399 P.3d 194 (2017); *Brownlee*, 302 Kan. at 503. Pledger waived her formal arraignment on October 29, 2015, so that's the day the speedy-trial clock began to run against the State. Since Pledger was out on bond, the State had 180 days to bring her to trial, making Pledger's statutory speedy-trial date April 26, 2016. (Although Pledger's bond was revoked for a short time pending trial, all parties agree that she was out of custody most of time and that the 180-day limit applies.) The district court set Pledger's trial to begin on April 11, 2016.

On February 26, 2016, 121 days after the speedy-trial clock had started, the district court ordered Pledger to undergo a competency evaluation. This stopped the clock. See K.S.A. 2018 Supp. 22-3402(e)(2) (The speedy-trial clock can be extended when "a proceeding to determine the defendant's competency to stand trial is pending."). The clock started again when the court found Pledger competent to stand trial on April 8, 2016. K.S.A. 2018 Supp. 22-3402(e)(2). Then, per Pledger's request, the court appointed her a new attorney and continued the case until April 15, 2016—time assessed to Pledger. See K.S.A. 2018 Supp. 22-3402(g) ("If a defendant, or a defendant's attorney in consultation with the defendant, requests a delay and such delay is granted, the delay shall be charged to the defendant . . . .").

Then the court granted these continuances, charging all time to Pledger:

- April 8, 2016 hearing: case continued until April 15, 2016, at Pledger's request.
- April 15, 2016 hearing: case continued until May 26, 2016, at Pledger's request.
- May 26, 2016 hearing: case continued until June 21, 2016, at Pledger's request.
- June 15, 2016 hearing: case continued until July 21, 2016, at Pledger's request so her new attorney could receive and review discovery.

- July 19, 2016 hearing: case continued until July 28, 2016, based on Pledger's motion to dismiss; Pledger told the court she didn't want to set the case for trial.

- July 28, 2016 hearing: Pledger's motion to dismiss is denied. After hearing from her bail bondsman, the court released the bondsman and Pledger was taken temporarily into custody. (The sentencing journal entry shows that she only spent that day in custody.) Trial was set for September 26, 2016.

- September 8, 2016: pretrial status conference continued until September 15, 2016, "to give court and [attorneys] time to review [Pledger's pro se] motions . . . ."

- September 19, 2016: case continued until November 21, 2016, "to address defendant['s] pro se motions." Pledger waived her right to have her trial reset within 90 days.

- November 21, 2016: case continued until December 21, 2016, at Pledger's request to have a hearing on her "supplemental writ to dismiss for destruction of evidence and writ to suppress" as well as her motion in limine.

- January 13, 2017: trial rescheduled for February 6, 2017 "for good cause shown."

- January 27, 2017: trial rescheduled for May 22, 2017 at Pledger's request. Pledger "waives speedy trial between [the dates]."

In summary, the district court first set Pledger's trial to begin 165 days after she waived her formal arraignment, and that fell within the statutory 180-day period. She was finally brought to trial 571 days after she waived her arraignment.

But just because Pledger wasn't brought to trial within 180 days of waiving her arraignment doesn't necessarily mean the State violated her statutory right to a speedy trial. Here, the speedy-trial clock was tolled between February 26, 2016, and April 8, 2016, pending the results of Pledger's competency hearing. See K.S.A. 2018 Supp. 22-3402(e)(2). Then starting on April 8, 2016, the court continued Pledger's case nearly a dozen times at Pledger's request. The maximum amount of time that could be attributed

to the State is the 120 days between October 29, 2015, when Pledger waived her arraignment, and February 26, 2016, when the court ordered the competency hearing. Except for the 14 days that passed between January 13, 2017, when the court rescheduled the trial for "good cause shown," and January 27, 2017, when it was rescheduled at Pledger's request, all delays were properly attributed to Pledger. We find no statutory speedy-trial violation.

*Constitutional Speedy-Trial Rights*

Pledger also argues that her constitutional right to a speedy trial was violated. Here too, we have unlimited review over a trial court's decision about an alleged violation of a defendant's constitutional right to speedy trial. *Hayden*, 281 Kan. at 126-27; *State v. Waldrup*, 46 Kan. App. 2d 656, 676, 263 P.3d 867 (2011).

The Sixth Amendment of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights guarantee a criminal defendant the right to a public and speedy trial. Unlike the statutory right to a speedy trial, which attaches when a defendant is arraigned or waives his or her arraignment, the constitutional speedy-trial right attaches at the formal charging or arrest, whichever occurs first. *State v. Rivera*, 277 Kan. 109, 112, 83 P.3d 169 (2004).

In *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court set forth a balancing test and provided four factors for courts to consider when determining whether a defendant's Sixth Amendment right to a speedy trial has been violated. These factors are (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his or her right, and (4) prejudice to the defendant. 407 U.S. at 530-32. No one factor is controlling in determining whether a defendant's constitutional right to a speedy trial has been violated. Instead, the factors must be considered together along with other relevant circumstances. 407 U.S. at

533. Kansas courts apply the *Barker* factors when analyzing the constitutional speedy-trial right under both the United States and Kansas Constitutions. See *Hayden*, 281 Kan. at 127; *State v. Davis*, 277 Kan. 309, 334, 85 P.3d 1164 (2004).

### 1. *Length of Delay*

Here, 840 days passed between February 2, 2015, when the State filed an information charging Pledger with four counts of aggravated battery, and the beginning of her trial on May 22, 2017. Pledger claims that "840 days is presumptively prejudicial." Even with the 840-day delay though, we must consider that delay in light of the other factors. As the Kansas Supreme Court has noted, "the delay in itself does not establish a violation," but "extended delay does serve to trigger examination of the other three factors." *State v. Wilson*, 227 Kan. 619, 622, 608 P.2d 1344 (1980). And a long delay may be considered presumptively prejudicial. See *State v. Weaver*, 276 Kan. 504, 78 P.3d 397 (2003) (finding a 450-day delay presumptively prejudicial under length of delay factor, but no constitutional speedy trial violation based on other three *Barker* factors); *State v. Fitch*, 249 Kan. 562, 564, 819 P.2d 1225 (1991) (finding a 402-day delay presumptively prejudicial).

But the mere existence of delay—even of a year or more—does not automatically prove a constitutional speedy-trial violation. See *State v. Calderon*, 233 Kan. 87, 94-95, 661 P.2d 781 (1983) (finding that a 13-month delay did not violate defendant's speedy-trial right); *Wilson*, 227 Kan. 619 (finding that a three-year delay did not violate defendant's speedy-trial right); *State v. Fink*, 217 Kan. 671, 678, 680, 538 P.2d 1390 (1975) (finding that a 14-month delay did not violate defendant's speedy-trial right); *State v. Hunt*, 8 Kan. App. 2d 162, 167-68, 651 P.2d 967 (1982) (finding that a one-year delay did not violate defendant's speedy-trial right); *State v. Dailey*, No. 102,957, 2011 WL 5833288, at *10 (Kan. App. 2011) (unpublished opinion) (finding that a 23-month delay did not violate defendant's speedy-trial right). We must look at the other *Barker* factors too.

### 2. Reason for Delay

Indeed, 840 days is a long time, and we consider it presumptively prejudicial. But most of the time that passed between the State charging Pledger with her crimes and the start of Pledger's trial was because of Pledger's requests to continue the case for one reason or another. Pledger doesn't dispute that. So the reasons for the delay in bringing Pledger to trial weigh almost entirely against Pledger. See *In re Care & Treatment of Ellison*, 305 Kan. 519, 535-36, 385 P.3d 15 (2016) ("'It is . . . a fair generalization that any period of delay attributable to the defendant will . . . be considered to fall within the valid reason category.'") (quoting 5 LaFave, Israel, King & Kerr, Criminal Procedure § 18.2[c] [4th ed. 2015]).

### 3. Assertion of Her Right

Although it's ultimately the State's duty to bring a defendant to trial, the *Barker* factors also weigh a defendant's efforts to assert the right to a speedy trial. *Fitch*, 249 Kan. at 565. Pledger filed a motion in December 2015 titled "DEMAND FOR A JURY TRIAL AND WAIVER OF FEES." In that motion, Pledger said "[t]his is a served demand by the Defendant for a jury trial on any and all factual issues triable by jury." But that motion also said that she "[DID] NOT CONSENT to moving forward with all proceedings of said case above."

Pledger also filed a pro se "EMERGENCY MOTION TO DISMISS" based on both statutory and constitutional speedy-trial violations. In that motion, Pledger claimed that she "did not cause or contribute to said delay by unavailability for trial, by requesting a continuance, by lack of investigation, or by lack of preparation for trial . . . ." She also argued that "[a]ny continuance requested . . . arose after the State's speedy trial violation and was a result of the State's obstruction of due process . . . ."

32

In neither of Pledger's motions did she demand a prompt trial. Instead, she either simply requested a jury trial while also stating that she didn't consent to other proceedings or she sought to have the court dismiss the charges against her. See *In re Care & Treatment of Ellison*, 305 Kan. at 539 (weighing this factor "only minimally in Ellison's favor, if at all, because the motions did not clearly assert the right [and] did not demand a prompt trial but instead sought to have the case dismissed"). Pledger did not assert her right to a speedy trial in any meaningful way until late in the process, and she did so then only by moving to dismiss, claiming her speedy-trial right had already been violated.

### 4. Prejudice Because of Delay

Finally, this court will consider the prejudice Pledger suffered because of the delay in her trial. While the presumptive prejudice of an 840-day delay merits full consideration of the *Barker* factors, we look at this stage of the analysis for actual prejudice. The *Barker* court identified three types of potential prejudice: oppressive pretrial incarceration; a defendant's anxiety and concern during the extended proceedings; and possible impairment of the defense. *Barker*, 407 U.S. at 532; *Rivera*, 277 Kan. at 118-19.

Pledger was out on bond, so oppressive pretrial incarceration isn't a consideration. And Pledger doesn't address either of the other potential ways in which she might have been prejudiced in her appellate brief. Instead, she merely cites a United States Supreme Court case, *United States v. MacDonald*, 456 U.S. 1, 8, 102 S. Ct. 1497, 71 L. Ed. 2d 696 (1982), to explain the purpose of the constitutional right to speedy trial. Because Pledger hasn't shown any way in which she was prejudiced by the delay, this factor weighs against her.

33

After considering all four factors, we conclude that Pledger's constitutional right to a speedy trial under the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights was not violated. Only one of the four factors—length of delay—is in her favor, and the others are not. She was responsible for most of the delay, she didn't explicitly assert her speedy-trial right, and she hasn't shown any actual prejudice.

IX. *There Was No Prosecutorial Error During the Closing Argument.*

Pledger next claims Spies committed prosecutorial error by commenting on Pledger's credibility during his closing argument. We consider claims of prosecutorial error in two steps. First, we look to see whether the prosecutor erred. Second, if there was an error, we must decide whether that error prejudiced the defendant's right to a fair trial. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

During his closing argument, Spies said:

"And keep in mind that she told you that she saw Mark Britt. Mark Britt, who had two broken legs and who had to learn how to walk again like a baby, she said she saw him walking around looking for his shoe. Members of the Jury, do you find that testimony credible?"

Pledger says that through this statement, Spies told the jury "that Pledger lied about Mark Britt walking around although he [had] broken legs."

In general, "prosecutors cannot offer juries their personal opinions on the credibility of witnesses." *State v. Peppers*, 294 Kan. 377, 396, 276 P.3d 148 (2012). This is because such comments are unsworn testimony by the prosecutor. See 294 Kan. at 396. In a leading case, *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000), the court found it improper when the prosecutor directly accused the defendant of lying 11 times during

34

closing argument. Pledger argues that Spies was calling her a liar in the closing argument here.

But just because a prosecutor can't offer their personal opinion about witness credibility or say, "The defendant is a liar," doesn't mean a prosecutor can't argue about witness credibility *based on* the evidence presented. The prosecutor can properly make statements to the jury that relate to what evidence a juror should use in assessing the witness' credibility. See *State v. Scaife*, 286 Kan. 614, 623-24, 186 P.3d 755 (2008); *State v. McDonald*, No. 116,925, 2018 WL 4039225, at *2 (Kan. App. 2018) (unpublished opinion), *petition for rev. filed* September 12, 2018. A prosecutor may advocate to the jury by presenting reasonable inferences from the evidence to argue that a story is either believable or unbelievable. *State v. Hart*, 297 Kan. 494, 505-06, 301 P.3d 1279 (2013).

Spies' argument here was permissible—he was arguing a reasonable inference from the evidence the jury had observed about Britt's injuries that directly related to Pledger's credibility. See *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011) ("A prosecutor may offer the jury an explanation of ""what it should look for in assessing witness credibility."""" [quoting *Scaife,* 286 Kan. at 624]). Spies essentially told the jury to consider the evidence showing that Britt had two broken legs when evaluating the credibility of Pledger's testimony that Britt was walking around after the accident. Spies encouraged the jury to draw its own conclusion about whether Pledger's testimony was believable; that doesn't go beyond the bounds of a proper closing argument.

Pledger also says Spies committed prosecutorial error because he "repeatedly cut [her] off while she testified." But she doesn't explain how this prejudiced her trial, and she doesn't support this claim by citing any caselaw or statute. The entirety of her claim is: "Finally, Pledger claims that the prosecutor repeatedly cut defendant off while she testified. . . . This obstruction coupled with the prejudicial and impermissible comment on her credibility denied her a fair trial." We do not consider that adequate briefing and

consider the issue abandoned. See Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34); *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019).

X. *The District Court Didn't Err in Denying Pledger's Motion for a New Trial.*

Pledger's next claim is that the district court erred in denying her motion for a new trial. We review a district court's denial of a motion for a new trial for an abuse of discretion. *State v. Holt*, 298 Kan. 469, Syl. ¶ 1, 313 P.3d 826 (2013). A court abuses its discretion when it decides based on an error of fact or law or when no reasonable person could agree with the decision. *Ward*, 292 Kan. at 550.

Under K.S.A. 2018 Supp. 22-3501(1), a district court may grant a new trial when required by the "interest of justice." Pledger argues that the court should have granted her a new trial because there wasn't enough evidence to prove that she acted recklessly and because cumulative error denied her a fair trial. We find no error in the denial of her motion.

First, sufficient evidence showed that Pledger acted recklessly. The State's evidence was that Pledger was driving at least 55 miles per hour when going over a hill in a 20-mile-per-hour residential area—at a time when she knew that kids had just been dropped off at the bottom of that hill. That's enough evidence to support the jury's finding that she acted recklessly.

Second, for cumulative error to merit the district court ordering a new trial, this court must find that the cumulative effect of several errors—none significant enough to warrant reversal on its own—substantially prejudiced the defendant and denied her a fair trial. *State v. Fisher*, 304 Kan. 242, 263, 373 P.3d 781 (2016). But we have found no trial errors here, so the cumulative-error rule doesn't apply.

XI. *The District Court Properly Sentenced Pledger Because Her Convictions Were Not Multiplicitous.*

Apart from errors in the trial itself, Pledger also argues that the district court improperly sentenced her because her convictions for aggravated battery and involuntary manslaughter are multiplicitous. We review multiplicity issues independently, with no required deference to the district court. *State v. Thompson*, 287 Kan. 238, 243, 200 P.3d 22 (2009).

Multiplicity is the charging of a single offense in more than one count. *State v. Pham*, 281 Kan. 1227, 1246, 136 P.3d 919 (2006); *State v. Wasylk*, No. 112,128, 2015 WL 6833835, at *13 (Kan. App. 2015) (unpublished opinion). That can be a problem because of the potential that a defendant receive multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. *Pham*, 281 Kan. at 1246.

We apply a two-part test for multiplicity issues. First, we must decide whether the convictions arise from the same conduct. If so, we then use the statutory definitions of the offenses to decide whether there are two offenses or only one. *State v. Pribble*, 304 Kan. 824, Syl. ¶¶ 1-4, 375 P.3d 966 (2016); *Schoonover*, 281 Kan. 453, Syl. ¶ 15.

Here, there's no dispute that Pledger's convictions are from a single course of conduct. Pledger argues that her convictions are multiplicitous under the statutory definitions because both the aggravated-battery and involuntary-manslaughter statutes require "reckless[] disregard[ of] the foreseeable conditions," thus making the offenses the same.

To determine whether a double-jeopardy issue arises from multiple convictions under different statutes, though, which is the situation here, our Supreme Court has adopted the "same-elements test" set forth in *Blockburger v. United States*, 284 U.S. 299,

304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). See *State v. Overman*, 301 Kan. 704, Syl. ¶ 6, 348 P.3d 516 (2015); *Schoonover*, 281 Kan. at 498. That test requires the court to decide whether one statute requires proof of an element that isn't necessary to prove the other offense. If the elements of the offenses are different, then "the statutes do not define the same conduct and there is not a double jeopardy violation." 281 Kan. at 498.

Pledger was convicted of one count of involuntary manslaughter and three counts of aggravated battery. The elements the State had to prove for the involuntary manslaughter it charged were that (1) the defendant killed Tierra Smith (2) by reckless conduct (3) on January 30, 2015, in Wyandotte County. See K.S.A. 2018 Supp. 21-5405(a)(1). The elements the State had to prove for the aggravated battery it charged were that (1) the defendant caused great bodily harm (2) by reckless conduct (3) on January 30, 2015, in Wyandotte County. See K.S.A. 2018 Supp. 21-5413(b)(2)(A). Although each offense requires the criminal act to have been performed recklessly, the involuntary-manslaughter statute requires the killing of a person, while the aggravated-battery statute requires only "great bodily harm." See K.S.A. 2018 Supp. 21-5405; K.S.A. 2018 Supp. 21-5413(b)(2)(A). Since each statute has a different triggering element, the charges are not multiplicitous and there is no double-jeopardy violation.

CONCLUSION

We have carefully reviewed each of the issues Pledger has raised in her appeal. We also appreciate the oral argument presented by each side. We find no reversible error, and we affirm the district court's judgment.